**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**J.B. RUSH, Defendant–Appellant.**

**No. 89–1626.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1989.

Decided Nov. 28, 1989.

Thomas M. Durkin, Asst. U.S. Atty., Donna B. Moore, Chicago, Ill., for plaintiff-appellee.

James W. Reilley, Reilley & Associates, Christine Curran, Des Plaines, Ill., for defendant-appellant.

Before WOOD, Jr., EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

J.B. Rush appeals a jury verdict and the sentence imposed. The jury convicted him of one count of conspiracy to possess and distribute heroin, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute heroin, in violation of 21

---

U.S.C. § 841(a)(1). The district court sentenced Mr. Rush to 140 months in prison. He submits that the conviction and sentence should be reversed because (1) the district court erred in denying his motion to suppress heroin found in his possession, (2) he was denied effective assistance of counsel, and (3) the district court erred in first admitting into evidence and then considering during sentencing the presence of a loaded gun in his car. We now affirm the defendant's conviction and sentence.

## I.

### Background

#### A. *The Arrest*

A joint task force of the Chicago Police Department and the Drug Enforcement Administration (DEA) monitors drug trafficking at Union Station. Task Force officers on duty on June 9, 1988, had been notified that a Victoriano Ramirez, who fit the drug courier profile, was arriving on the train from Los Angeles. Officers Thomas Kinsella and Richard Boyle watched Ramirez get off the train carrying a suitcase and a shoulder bag. He walked into the terminal where he was met by the defendant, J.B. Rush. Officer Kinsella heard the defendant greet Ramirez and say, "Victor, have you got it, have you got it? Which one?" Tr. at 14. Ramirez then handed the suitcase to Mr. Rush, who said, "Come on, this way." *Id.* at 15–16. Mr. Rush also told Ramirez, "I've got my car right outside." *Id.* at 19.

The two officers approached Mr. Rush and Ramirez as the pair headed toward the exit. Officer Kinsella identified himself, and Mr. Rush agreed to talk with him. In response to Officer Kinsella's questions, Mr. Rush said he was in the real estate business and was "just hanging around" the terminal. *Id.* at 22–23. He admitted that he was picking up Ramirez, but maintained that their encounter was "coincidence"; he "just happened to see [Ramirez] here." *Id.* When Officer Kinsella inquired how he knew Ramirez, Mr. Rush asked the reason for the officer's inquiry. Officer Kinsella indicated that he was con-

ducting a narcotics investigation. Mr. Rush then responded, "I don't know him [Ramirez] at all. I'm not with him." *Id.* at 23. With regard to the suitcase he was carrying, Mr. Rush pointed at Ramirez and stated, "It's his. It's not mine." *Id.*

While Officer Kinsella and Mr. Rush spoke, Officer Boyle talked with Ramirez. Ramirez stated that he had come to Chicago to visit his friend "J.B." Ramirez further admitted that all the luggage was his and that he was not carrying packages for anyone. He agreed to let Officer Boyle search his luggage and gave the officer the key to his suitcase.

Mr. Rush watched the search and said, "I don't know what he's got in that bag. Ain't none of it for me." *Id.* at 24. Officer Boyle then removed a gift-wrapped package from the suitcase, opened it, and found wrapped packets of heroin inside. Mr. Rush and Ramirez were arrested and advised of their rights. Both men then were taken to the Union Station security office.

In the office, Mr. Rush was questioned about his car. He stated that he had left it in a parking lot, located approximately one mile from Union Station, but Officer Boyle's investigation revealed that Mr. Rush's 1988 Cadillac was parked outside the exit toward which he and Ramirez had been walking before they were stopped. The government seized the car after discovering it belonged to Mr. Rush. In October 1988, a DEA agent was assigned to remove the cellular phone from the car and discovered a loaded pistol. The gun was located behind a loose rear seat backrest.

#### B. *The Suppression Hearing*

Mr. Rush moved to suppress the drugs found in the suitcase he had been carrying when arrested. The government countered that he had no expectation of privacy in the suitcase, and therefore challenged his standing to assert a fourth amendment violation. Officer Kinsella testified that Mr. Rush had disclaimed ownership of the suitcase and had stated the luggage belonged to Ramirez. Defense counsel did not ask Mr. Rush about this disclaimer during his testimony. However, in his closing state-

ment, counsel did address the standing issue. He argued that the disclaimers were not valid because Mr. Rush had possession of the suitcase and, consequently, there was a reasonable expectation of privacy in the suitcase.

The district court agreed with the government's position in all respects and denied Mr. Rush's motion. The district court found that Ramirez had consented to the search of the luggage. The court also held that police officers are not required to obtain consent to search from a person who has disclaimed ownership of an item and therefore rejected Mr. Rush's claim that the government needed his consent before it could search Ramirez' suitcase.

## C. *The Trial*

At trial, the government established the facts set out above. Through the testimony of Murny Miller, keeper of the records for the Illinois Bell Telephone Company, the government also admitted (without objection) three phone number listings in Mr. Rush's name. The records revealed that, on June 5 and 6, 1988, calls were made from one of those numbers to a number in California (818–768–4351). On cross-examination, defense counsel questioned Ms. Miller about Government Exhibit 2B, a card with the number "768–4351" written on it that was found in Ramirez' wallet. The witness testified that, without the area code, she could not state conclusively that the number was from California. The government ultimately introduced its Exhibit 2B into evidence, without objection, through the officer who had removed the contents of Ramirez' wallet.

The last government witness, a Cadillac salesman, stated that he could not specifically recall selling a car to Mr. Rush. The salesman identified a buyer's order for a 1988 Cadillac in the name of Gloria Long, and testified that it is not unusual for someone to buy a car and put it in someone else's name.

The defense called two witnesses. On direct examination, Gloria Long stated that she was Mr. Rush's niece and that she knew he had purchased the 1988 Cadillac in

her name. On cross-examination, she testified that the defendant "customarily" purchased his cars in her name. Ms. Long also testified that Mr. Rush was in the real estate business, occasionally drove a cab, and had recently won approximately fifteen thousand dollars in the Illinois State Lottery.

The defense called Glenda Gray, a real estate attorney. Ms. Gray testified that no license was required to buy, sell, or manage your own property. The parties stipulated that the defendant had never been licensed as a real estate salesperson or broker.

The jury returned a verdict of guilty. Mr. Rush subsequently moved for a new trial based on ineffective representation by his defense counsel. The district court determined that defense counsel was not ineffective and therefore denied the motion.

## D. *Sentencing*

In calculating the defendant's sentence under the Federal Sentencing Guidelines, the probation officer recommended a two level enhancement pursuant to guideline § 2D1.1(b) (possession of a firearm). Mr. Rush argued he did not possess the weapon at the time of arrest. The district court found there was a clear inference from the evidence that Mr. Rush and Ramirez were walking to Mr. Rush's car, which contained a gun. Therefore, the court held the evidence established that the defendant possessed a gun in the commission of the offense, and thus imposed the enhancement.

## II.

### Discussion

### A. *The Motion to Suppress*

█ Mr. Rush claims that the district court should have granted the motion to suppress the drugs found in the suitcase that Ramirez had given Mr. Rush upon their meeting in Union Station. Mr. Rush was carrying the suitcase through the terminal at the time of the encounter with the police officers. There is no dispute that

Mr. Rush disclaimed ownership when the officers inquired. Nevertheless, he submits that the officers were obliged to disregard this disclaimer and seek his permission to search the bag because they had overheard him ask Ramirez which bag contained the drugs and had observed him carry that bag from the station. Mr. Rush further submits that the government should not be allowed to take the "inconsistent position" that Mr. Rush cannot assert an expectation of privacy in the suitcase because of his disclaimer, but that he can be found guilty of the knowing possession of the narcotics.

In assessing Mr. Rush's contentions, we begin by reiterating that the denial of a motion to suppress will not be overturned on appeal unless it is clearly erroneous. *See United States v. Dunigan,* 884 F.2d 1010, 1014 (7th Cir.1989); *United States v. D'Antoni,* 856 F.2d 975, 978 (7th Cir.1988). We shall accept the findings of fact of the district court unless they are clearly erroneous. *D'Antoni,* 856 F.2d at 978.

Law enforcement officers seeking to search private property must respect a "legitimate expectation of privacy" in that property. *Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 429–30, 58 L.Ed.2d 387 (1978). As this court noted in *United States v. Peters,* 791 F.2d 1270, 1281 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986), the Supreme Court has stated that the determination of whether an individual has such a "legitimate expectation of privacy"

> "normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'— whether ... the individual has shown that 'he seeks to preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'—whether the

individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (*quoting Katz v. United States,* 389 U.S. 347, 353, 351, 361, 88 S.Ct. 507, 512, 511, 516, 19 L.Ed.2d 576 (1967) (citations omitted)).

Other circuits have interpreted the Supreme Court's direction in identical fashion. *See, e.g., United States v. McBean,* 861 F.2d 1570, 1573 & n. 7 (11th Cir.1988); *United States v. Knox,* 839 F.2d 285, 293 (6th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Here, the first prong of the inquiry resolves the matter. Our colleagues in the Eleventh Circuit have stated the governing principle bluntly but correctly: "an individual who abandons luggage at the time of a search is precluded from challenging the legality of the search because he has no legitimate expectation of privacy in the abandoned luggage." *McBean,* 861 F.2d at 1574. Here, at the time of the officer's inquiry, "[n]ot only did [the defendant] fail to manifest a subjective expectation of privacy in the luggage and its contents, he affirmatively disavowed any such expectation." *Id.; see also Knox,* 839 F.2d at 293–94.

Mr. Rush's denial of ownership of the suitcase is, in our view, sufficient to preclude his assertion of any legitimate expectation of privacy in the bag. However, even if we were to look beyond his disavowal and examine the surrounding circumstances,[1] our conclusion necessarily would be the same. Here, Mr. Rush not only disavowed ownership in the suitcase, but affirmatively identified Ramirez as the owner. Moreover, Ramirez acknowledged ownership and possessed the key to the bag. Under these circumstances, the officers certainly were justified in concluding that Mr. Rush had no expectation of privacy with respect to the bag and that, conse-

---

1. In *United States v. Issacs,* 708 F.2d 1365, 1367–68 (9th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983) and *United States v. Hawkins,* 681 F.2d 1343, 1345–46 (11th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982), the courts examined the to-

tality of the circumstances to determine whether an individual had a legitimate expectation of privacy. In *United States v. McBean,* 861 F.2d 1570, 1574 (11th Cir.1988), the Eleventh Circuit appears to have focused solely on the defendant's verbal abandonment of the luggage.

quently, it was not necessary to obtain his permission to search it.

## B. *Admission of the Loaded Gun*

■ Mr. Rush contends that the district court committed reversible error when it admitted into evidence a loaded .38 caliber revolver that was found in the defendant's car. The weapon was discovered when, several months after the arrest, an investigative assistant was removing a cellular phone from the impounded vehicle. It appears that Mr. Rush did not object to the admission of this weapon at trial.[2] Therefore, we must review its admission under the plain error standard. *See* Fed.R. Crim.P. 52(b); *see also United States v. DeSoto*, 885 F.2d 354, 362 n. 4, 363 (7th Cir.1989) (plain error standard of 52(b) applies because defendants did not object to evidence during trial); *United States v. Moya–Gomez*, 860 F.2d 706, 717 n. 11 (7th Cir.1988) ("A defendant may not argue as a ground for reversal an issue that was not presented to the trial court. The waiver rule is, of course, subject to the plain error doctrine of Rule 52(b) of the Federal Rules of Criminal Procedure.") (citations omitted), *cert. denied*, —— U.S. ——, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). "A plain error is one that results in 'an actual miscarriage of justice.'" *United States v. Wynn*, 845 F.2d 1439, 1442–43 (7th Cir.1988) (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)).

District courts have, of course, "broad discretion on evidentiary matters"—including the issue of relevancy. *United States v. Alvarez*, 860 F.2d 801, 829 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989). Moreover, we have acknowledged that a weapon is a "tool of the trade" in the illegal drug industry. *Id.* at 830. Our colleagues in the Second Circuit have stated the rationale succinctly and realistically: "[e]xperience on the trial

and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

Here, the evidence at trial established that Mr. Rush drove his automobile to Union Station in order to pick up Ramirez and his illegal cargo and transport them to another location. Mr. Rush had assured Ramirez that he had his car "right outside." Tr. at 19. The car was located immediately outside the station and, at the time of their arrest, Mr. Rush and his confederate were walking toward an exit that led immediately to the car. Moreover, Mr. Rush had a set of car keys with him at the time of his arrest. The government was entitled to argue—and the jury entitled to conclude—that the weapon was in the car to protect Mr. Rush and his illegal cargo. The weapon also was relevant to rebut the defendant's contention that he was unaware of the contents of the suitcase. We are not impressed with the arguments that the gun cannot be considered a "tool" of the trade because the defendant was not in the car at the time of the arrest and because it was not discovered immediately by the arresting officers. The weapon was part of the "equipment" with which Mr. Rush outfitted his car in order to permit him to engage in this illegal undertaking. The district court acted well within its discretion in admitting the weapon into evidence.

## C. *Adequacy of Trial Counsel*

Mr. Rush also submits that his counsel at trial rendered constitutionally inadequate performance. On this issue, the governing principles were set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). They have been applied consistently by this circuit ever since. As we said in

---

**2.** At the time the weapon was admitted, defense counsel stated he had no objection to its receipt into evidence. There is nothing in the record to indicate Mr. Rush challenged admission of the gun, though at trial defense counsel made a vague reference to an earlier discussion. We also note that the government supplied the district court with a memorandum of law in support of the weapon's admission.

*Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir.1987):

> The burden on the petitioner is a heavy one. In order to establish that he was denied his sixth amendment right to counsel, he must affirmatively establish both "components" of the *Strickland* analysis—the "performance" component and the "prejudice" component. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1011 (7th Cir.1987).
>
> With respect to the "performance" component, "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. In evaluating counsel's performance, "all the circumstances," *id.,* must be considered.
>
> > No particular set of detailed rules for counsel's conduct can satisfactorily account for the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.
>
> *Id.* at 688–89, 104 S.Ct. at 2065. In assessing counsel's performance, our scrutiny must be "highly deferential." *Id.* at 689, 104 S.Ct. at 2065. We must make "every effort ... to eliminate the distorting effects of hindsight" by indulging in the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.*
>
> ....
>
> With respect to the "prejudice" component, it "is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for coun-

sel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

> Finally, throughout the analysis, we must remember that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. at 2069. We must determine "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

*Id.* at 1390–91. Finally, we must remember that:

> *Strickland* did not "establish mechanical rules;" "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* 466 U.S. at 696, 104 S.Ct. at 2069. Therefore, the components of the *Strickland* analysis cannot be treated as hermetically sealed containers. Our inquiry with respect to one component will therefore often shed a valuable cross-light upon our inquiry with respect to the other. Indeed, the Supreme Court noted in *Strickland* that:
>
> > a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
>
> *Id.* at 697, 104 S.Ct. at 2069–70; *see also United States ex rel. Smith v. Lane,* 794 F.2d 287, 290 (7th Cir.1986); *United States v. Liefer,* 778 F.2d 1236, 1253 (7th Cir.1985); *Rogers v. Israel,* 746 F.2d 1288, 1292 & n. 3 (7th Cir.1984).

*United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1013–14 (7th Cir.1987).

Mr. Rush raises several matters that, in his view, constitute inadequate representation by his trial counsel. However, none of them can meet the "high hurdle," *Sullivan*, 819 F.2d at 1391, established by *Strickland*. Mr. Rush first contends that his counsel did not investigate adequately his standing to challenge the search of the bag containing illegal narcotics. He submits that counsel should have given him an opportunity to repudiate his disclaimer of ownership and to assert his expectation of privacy. This suggestion is without any merit. As the government puts it, "[t]he problem trial counsel was facing was that the law and the facts relating to the seizure clearly established that the defendant had no standing." Government's Br. at 11. It was the task of the district court to assess the facts as they were presented to the officers at the time of the search. Mr. Rush's *post facto*, self-serving statement that he did not mean what he said was not relevant to that inquiry. Moreover, Mr. Rush still would have had to explain why Ramirez had not only claimed ownership but also had the key. Trial counsel certainly did not commit an egregious error by not developing a line of inquiry that would not have aided Mr. Rush. We also note that counsel did argue the standing issue to the district court. He cannot be faulted for taking the facts as he found them and refraining from introducing testimony that, even if believed, would not have established the unreasonableness of the officers' decision to act on the information supplied them by the defendant.

Mr. Rush also contends that his counsel concerned himself with collateral issues and failed to introduce evidence with respect to the main issue of whether Mr. Rush *knowingly* possessed contraband. However, this contention is presented here, as it was in his motion for new trial, simply in conclusory statements. We are not told whether such evidence existed and, if it did, the nature of that evidence. *See United States v. Giangrosso*, 779 F.2d 376, 381 (7th Cir.1985) (defendant failed to establish prejudice component when she did not specify on appeal the evidence defense counsel allegedly should have introduced), *cert. de-*

*nied*, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986). We must remember that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066.

Mr. Rush also submits that his counsel elicited prejudicial evidence in his cross-examination of Murny Miller, keeper of the records for Illinois Bell Telephone, and in his direct examination of Gloria Long, the defendant's niece. Neither of these submissions requires extended discussion on our part. Ms. Miller's testimony circumstantially linked both Mr. Rush and Ramirez to the same telephone number in California. However, this linkage could have been and indeed was established by other evidence. Defense counsel may well have decided to elicit the information himself in order to focus the jury on his explanation of its significance. Such a tactical choice is not subject to our second-guessing. Ms. Long's testimony concerning Mr. Rush's ownership of the car was of marginal relevance. Legal ownership was not the key factor. Actual control was the key factor and was established through other testimony. Moreover, the remainder of Ms. Long's testimony supported Mr. Rush's defense. It provided an explanation, if the jury had decided to accept it, for Mr. Rush's presence at the airport. It also provided an explanation for his sources of income.

In sum, on the basis of the case he presented to the district court in his motion for new trial and to this court in his appellate brief, Mr. Rush cannot be counted among those "few petitioners" who "will be able to pass through the 'eye of the

needle' created by *Strickland.*" *Sullivan,* 819 F.2d at 1391 (footnote omitted).

### D. *Consideration of the Recovered Weapon at Sentencing*

█ Mr. Rush finally submits that the weapon recovered from his car ought not to have been considered in assessing his sentence. He submits that he did not utilize the gun in any manner in the commission of the offenses for which he was convicted. Furthermore, he notes the gun was recovered from a car parked a considerable distance from where he was apprehended.

Section 2D1.1(b)(1) of the Sentencing Guidelines provides for an increase of two levels when a firearm or dangerous weapon was possessed during the commission of a drug offense. The commentary to section 2D1.1 notes that:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

Section 2D1.1, Application Note 3. Noting that the defendant and Ramirez were proceeding toward the car at the time of their arrest, the district court concluded:

> [the] gun was in that car and narcotics were in that suitcase, and that means, in my view, the firearm will be possessed or is possessed by the defendant in the commission of the offense. The offense is possession with intent to distribute. I don't think it makes any difference whether they arrested him when he was sitting in the car or whether they arrested him on his way to the car from the station.

Tr. at 220–21.

We must give "due deference" to the district court's determination that the defendant possessed the weapon at the time of the offense. *See* 18 U.S.C. § 3742(e) ("The court of appeals ... shall give due deference to the district court's application of the guidelines to the facts."). Here, there is a solid foundation for the district court's determination. The car, equipped with the loaded weapon, was, as the district court implied, an essential part of the crime of possession with intent to distribute—a crime that, had it not been interrupted, would have continued through the very use of the car. The charged conspiracy also involved the weapon-outfitted car. Indeed, the car was an essential tool of the conspiracy—a conspiracy in which the defendant had the comfort of knowing that a loaded weapon was close at hand.

### Conclusion

Mr. Rush was accorded a fair trial. The district court imposed a sentence that conformed to the letter and spirit of the guidelines. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.