[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant has moved to suppress 170 pounds of marijuana seized from four suitcases inside the trunk of a motor vehicle he was operating, as well as his alleged admission prior to the seizure that he had been smoking marijuana in the vehicle. On August 26, 1999, the court conducted an evidential hearing at which the officer who made the seizure, Trooper Andre Joyner, and the defendant testified. They were the only witnesses.
In support of his claim at oral argument or in his brief the defendant asserts a number of alternative arguments. In the first instance the defendant claims the stop was illegal from the outset because there was no speeding, no clock and no probable cause to make a motor vehicle stop. The defendant had not committed any violation. The defendant next asserts that the stop of the defendant's vehicle was pretextual in that it was the result of illegal racial profiling, if not initially when the trooper began his clock, if a clock were found, then when he discovered the age and race of the vehicle's occupants.
If the defendant had been the subject of a valid motor CT Page 13471 vehicle stop, the defendant argues, it was unduly prolonged, with no reasonable or articulable basis for its extension. The defendant argues that the seizure of the marijuana and his alleged statement were the products of an illegal and unjustified detention, with no legal basis for a protective search of the passenger compartment and no probable cause to search the automobile. At oral argument the defendant argued that the officer lost whatever right he had to search the vehicle for a weapon when the occupants exited the vehicle. This issue has not been briefed. Finally, the defendant asserts he did not consent to the search of the vehicle.
The State counters with alternative arguments. Initially the state claims the seizure was the result of a valid motor vehicle stop, which as it unfolded, escalated into a situation where the officer, out of concern for his personal safety, had a reasonable and articulable basis to search the passenger compartment for weapons. Once in the course of that limited search for weapons, the officer having found the remnants of a marijuana cigar, known as a "Philly Blunt", the state claims that the officer had probable cause to search the motor vehicle and all of its contents.
Independent of its claim of a valid extension of a motor vehicle stop, the State next claims that the defendant voluntarily consented to the search of the vehicle.
The state further argues that the defendant had no standing to object to the search of the suitcases because he claimed no interest in them. Finally the state relies upon the inevitable discovery exception.
Each of the State's arguments is independent of the others and by itself sufficient to defeat this motion. Therefore if the state can prevail on at least one of its alternative claims the court need go no further.
In the absence of a warrant, and there was none, the state has the burden to prove by a preponderance of the evidence any one of its alternate arguments. The State has met this burden as set forth hereafter.
Having reviewed the testimony, the exhibit, the oral arguments, and the briefs, the court finds the following facts proven by the State by at least by a preponderance of the CT Page 13472 evidence.
As a preliminary comment the court notes that in determining what facts the state has proven by a preponderance of the evidence, the court has found the testimony of Trooper Joyner to be credible. The defendant, while having no burden of proof at all, outside the issue of standing, also testified and in most respects his testimony generally conflicted with that of the trooper. Having seen and heard the defendant, and evaluating his testimony no differently from that of the trooper, the court does not find the defendant credible.
On June 22, 1998, at approximately 1:30 A.M., Trooper Joyner of the Connecticut State Police, was on traffic enforcement duty. He was parked in a nose out position to observe traffic in the north bound lanes of 1-91 near exit 10 in North Haven, Connecticut. He was alone. He saw a motor vehicle passing by at a high rate of speed. The speed limit in that area is 55 mph. After the vehicle passed him the trooper saw its brake lights go on and its speed decrease. The trooper could not determine how many occupants were in the vehicle or what their race was. The trooper pulled out to establish a speed clock. Thereafter over a distance of some three tenths of a mile, the trooper, clocked the vehicle's speed at 64 mph which was nine miles over the limit. At some point before activating his lights and siren the trooper also saw this vehicle change from the center to the right lane of the highway without a signal. The trooper activated his equipment and pulled the vehicle over on the right shoulder, probably within two miles from where the trooper had first seen the vehicle. The trooper approached the passenger side of the vehicle to avoid passing traffic.
The trooper had first noticed the vehicle bore a New Jersey license plate after he had begun his clock. Before exiting his cruiser the trooper had called in the registration plate to see if it were a stolen vehicle. At some point, probably over his portable radio, after he had exited his cruiser, the trooper was advised the vehicle had not been reported stolen.
Through the passenger window the trooper asked the operator, the defendant, for his license and registration. There was also a front seat passenger, Laing. Both the defendant and the passenger were young black males.
Because of the noise from passing traffic and a reluctance to CT Page 13473 talk over the passenger, the trooper asked the defendant to step out and to the rear of the vehicle. He did. The defendant was nervous. The passenger remained inside the vehicle.
At the rear of the vehicle the trooper told the defendant he had pulled him over for speeding and an unsafe lane change and that he would issue the defendant a traffic citation.
The defendant had given the trooper his license and a rental agreement in lieu of a registration. Upon examining the defendant's Connecticut license the trooper noted the defendant's picture was on it. The trooper, who was familiar with motor vehicle rental agreement forms from his prior experience, noted that the defendant's name did not appear in the rental agreement in any capacity. The agreement showed the car was leased to a Ms. Sherlene Johnson. The defendant was neither listed as the renter or as an authorized driver. Upon reviewing the license and rental agreement the trooper did not immediately return to his cruiser to either verify the defendant's license or to contact the rental agency to see if it wanted the vehicle towed. The trooper's procedure was not set in stone. It varied with the circumstances of each stop. It was not the trooper's custom to always immediately verify a license and sometimes not at all in routine motor vehicle stops where the license photo matched the operator. Before contacting the rental agency, the trooper wanted to make sure he had enough information about the vehicle. He was concerned by the absence of the defendant's name in the rental agreement and he knew from prior experience that the vehicle could either be stolen, and as yet not reported or kept beyond the rental term and overdue. In any event the defendant was an unauthorized driver. Consequently, he spoke further to the defendant to address these concerns and the situation escalated.
Upon inquiring as to why he did not appear in the rental agreement, the defendant responded he was taking the vehicle back to Sherlene Johnson, in Hartford. Upon being asked where he had been the defendant replied that he was returning from New Haven.
During these events the passenger had been seated in the right front seat of the vehicle. The trooper left the defendant at the rear of the vehicle and went back to speak to the passenger to learn his identity and his connection, if any, to the rental agreement. The passenger gave his license to the trooper. The passenger was unusually nervous, breathing heavily and his chest was going up and down. Upon inquiry the passenger CT Page 13474 told the trooper that he and the defendant were traveling from New York. They had not been in New Haven. He had no connection to the rental agreement.
At this point the trooper's concern for his personal safety was escalating. Both individuals were nervous, Neither individual was on the rental agreement and there were conflicting versions about where the vehicle had been.
Leaving the passenger seated inside, the trooper returned to the rear of the vehicle to talk further with the defendant. He asked the defendant if he had been using drugs or alcohol or was carrying any weapons. The defendant said no. The trooper was still alone. He patted the defendant down for a weapon and found none.
About this time the trooper also observed the passenger change his position in the front seat. He was now slouching down, getting low in the seat and for the first time peeking through a corner of the window towards the rear to watch the trooper.
Based upon this observation as well as all that had transpired so far, the trooper was concerned for his own personal safety because the passenger may have been reaching for a weapon. The trooper then asked the passenger to exit the vehicle and he patted him down for a weapon. He had none.
The defendant, upon inquiry, allowed the trooper to search the vehicle's passenger compartment. The trooper then asked both individuals to move to the front of their vehicle where he could observe them both as he looked inside.
The trooper's sole purpose in searching the passenger compartment was to check for weapons out of concern for his personal safety.
The defendant and passenger had access to the vehicle's interior to retrieve a weapon. At this stage, the trooper was reluctant to allow them back into the vehicle without checking the interior for a weapon.
In making its factual findings the court can only state them sequentially. They occurred, however, in Kaleidoscopic fashion and rather quickly. From the time the trooper first saw the vehicle speeding by until he began his protective search of the CT Page 13475 interior probably no more than ten minutes or so had elapsed.
The court finds as a matter of law, from the facts it has found, that as the situation escalated and before he searched the passenger compartment, the trooper objectively possessed a reasonable belief, based on the specific and articulable facts found by this court, when considered with the rational inferences that can be draw therefrom, that the suspects were potentially dangerous and his personal safety was jeopardized. The defendant or his passenger could still gain immediate control of a weapon inside the vehicle.
Acting with such belief, the trooper opened the car door. As he did so, almost immediately, he saw an open ashtray in plain view near the dashboard. In plain view within that ashtray the trooper saw what he reasonably and objectively suspected to be the remnant of a marijuana filled cigar commonly called a "Philly Blunt". The trooper relied upon his training, experience and observations in drawing this conclusion. He knew a "Philly Blunt" is a cigar in which the filling is removed leaving only the outside wrapper. The filling is replaced with marijuana and the outside wrapper is then rerolled in a particular fashion with a significantly thinner, smaller, diameter. The trooper also knew the difference between an illegal "Philly Blunt" and a legal cigar. He had received training in the use of illegal substances and he had seen "Philly Blunts" on numerous prior occasions. Also consistent with his prior experience was the length to which the remnant had burned down. It was short, probably one third of an inch long. The fact that the remnant was rerolled, its diameter, its length, its similarity to known remnants of other Philly Blunts the trooper had seen, and his training, all led the trooper to objectively and reasonably believe that he had found a "Philly Blunt". His conclusion was not undercut by the absence of any other evidence of marijuana including its distinctive smell which over some unknown period could have dissipated through open windows. The remnant was not preserved as evidence. It's unavailability, even if the court were to draw an adverse inference therefrom, is not adequate to undercut the court's conclusion that the trooper had a reasonable belief that he had found marijuana.
The trooper completed his search of the interior for weapons and found none. He then asked the defendant if he had been smoking marijuana in the vehicle and the defendant said he had earlier. It is this admission the defendant seeks to suppress, on CT Page 13476 the sole basis that it was the product of an illegal stop or an illegally prolonged detention.
At no time did the race or age of the defendant or his passenger play any role at all in the conduct of the trooper who is himself a twenty eight year old black male. The facts the vehicle had New Jersey plates and was occupied by two young black males from Hartford, who were out at 1:30 a.m., did not shape the troopers conduct at all. Had the defendant provided a registration or rental agreement in which his name appeared, the trooper would have issued a motor vehicle citation and sent the defendant on his way.
The trooper continued to hold the defendant's license as well as the passenger's and the rental agreement. He never issued the initially advertised motor vehicle citation.
Having found what he reasonably suspected was a "Philly Blunt" the trooper now had, with or without the admission of the defendant, and with or without the defendant's consent, probable cause to arrest the defendant and to search the entire vehicle and its contents including the suitcases for drugs. State v.Longo, 243 Conn. 732 (1998); Wyoming v. Houghton, 119 S.Ct. 1297
(1999). The trooper proceeded further asking the defendant if he could look in the trunk. The defendant said yes and retrieved the keys from the ignition whereupon he went to the trunk and opened it himself. The trooper still had not drawn his weapon or placed the defendant under arrest. At no time, did the trooper in any fashion force the defendant to agree to a search of the passenger compartment or to open the trunk.
Inside the trunk were four closed suitcases. They looked new. The defendant was still extremely nervous and he remained so. He began to walk away quickly. It was not a casual walk and the trooper thought this was odd. The trooper called him back and he came.
The trooper asked him what was inside. He said his aunt's clothes. The trooper was still concerned that the suitcases contained weapons or drugs. At no time did the defendant say the suitcases were his. He made no claim to them or their contents. When asked to open them the defendant said he could not get inside. The trooper did not see any lock.
The trooper asked the defendant to take out one of the CT Page 13477 suitcases. He agreed. It was very heavy, inconsistent with containing clothes. The defendant had to drag it out.
The defendant walked away again. The trooper called him back again and he came. The trooper asked him to remove another suitcase from the trunk. He did. Then the defendant fled into the woods and his passenger followed suit. The defendant never objected to the search of the vehicle, the trunk or the suitcases.
The trooper held the scene. He did not pursue the individuals because he was concerned they would double back and get behind him. He called for back up. It arrived. Approximately 170 lbs of marijuana in four large blocks in protected wrappings were found inside the suitcases. They are the subject of the motion to suppress.
Other facts found proven by the court will be stated as necessary in the context of this memorandum.
I VALID ESCALATING MOTOR VEHICLE STOP
From these facts the court concludes that the trooper made a valid motor vehicle stop intending initially only to issue a traffic citation to the defendant. There was no racial profiling at any time and the trooper's conduct at any point along the chain of events was not affected by race, age or any other demographic factor. Racial profiling cannot be condoned. It did not occur here. There was no pretextual stop.
Under the circumstances found by the court, Trooper Joyner was acting within his authority in stopping the defendant's vehicle and in asking him to exit the same. State v. Dukes,209 Conn. 98, 122 (1998). Pennsylvania v. Mims, 434 U.S. 106, 108-11
(1997).
The defendant at oral argument asserted that if in fact a valid motor vehicle did occur, and this court has so found, that upon exiting his cruiser, the trooper's only option was to immediately verify the validity of the defendant's license and the rental argument. Upon that verification the trooper should have issued a traffic citation to the defendant and sent him on his way. At most the trooper could have patted the suspects down and then placed them in his cruiser while he radioed the rental agency. The defendant argues that there was no basis in the CT Page 13478 ensuing circumstances for any other courses of conduct. The trooper should have followed what the defendant claims was standard procedure. In fact there was no standard procedure. The trooper's conduct varied with the circumstances of any given stop. The court has reached this claim because it is unclear whether it is encompassed within the defendant's brief.
Here the situation had ripened from a valid routine motor vehicle stop into a situation where a protective search of the passenger compartment for a weapon was warranted. It was while in the exercise of that constitutionally permissible search, that the trooper found the "Philly Blunt" in plain view. The trooper was entitled to be where he was when he made that discovery and this is fatal for the defendant's claim the marijuana seizure was the result of either an initially illegal stop or an unduly prolonged motor vehicle stop. At oral argument, as a matter of law, without prejudice to his factual arguments, the defendant conceded that if while inside the passenger compartment in the course of a legitimate protective search, the trooper had probable cause to believe he had found a "Philly Blunt", then he had the right to search the entire automobile including the trunk and the suitcases. That is precisely what the court has found based upon its factual findings and legal conclusions therefrom. There was no initial illegal stop or unduly prolonged stop tainting all that followed.
The court's legal conclusions are informed by a line of cases including Michigan v. Long, 463 U.S. 1032 (1983), establishing the right of an officer, upon a motor vehicle stop, under circumstances similar to those found here, to conduct a less than probable cause search not only of the suspect himself, but of the passenger compartment of his automobile. The need for the police to protect themselves in a potentially dangerous situation outweighs the limited intrusion upon the suspects privacy rights.
The language of the court is most informative:
 Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounter between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those CT Page 13479 areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See Terry, 392 U.S., at 21. "[t]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id., at 27. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. If, while conducting a legitimate Terry search of the interior of the automobile, the officer should, as here, discover contraband other that weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances. Coolidge v. New Hampshire, 403 U.S. 443, 465 (1972); Michigan v. Tyler, 436 U.S. 499, 509 (1978); Texas v. Brown, 460 U.S., at 739 (plurality opinion by REHNQUIST, J.); id., at 746 (POWELL, J., concurring in judgment).
Michigan v. Long, supra, at pp 1049-50.
Our own Connecticut Supreme Court has endorsed this reasoning in State v. Wilkins, 240 Conn. 489 (1997) in analogous circumstances wherein the defendant asserted that seizure was the result of exceeding the permissible bounds of his original stop. Justice Katz in writing for the majority, stated:
 Moreover, although nothing was discovered here during the patdown of the defendant or his passenger, Ciesinski still had not had the opportunity to search the vehicle to dispel his initial reasonable concerns of a safety threat. At that point in time, Ciesinski had two choices — either issue a summons and release the defendant or arrest him for the misdemeanor offense. If he merely intended to issue a summons and release the defendant, Ciesinski would have been reasonably justified in making sure there was no weapon available to the defendant immediately upon his release. Michigan v. Long, supra, 463 U.S. 1051-52 ("[t]he officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within [the defendant's] immediate grasp before permitting him to reenter his automobile . . . [I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and CT Page 13480 he will then have access to any weapons inside.") see United States v. Sanders, 994 F.2d 200 (5th Cir. 1993) (if no probable cause for arrest, officer would have released defendant who would then have had ability to reach gun). We conclude that the officers here were justified in checking the vehicle before releasing the two men, either of whom would have had access to the vehicle and any weapon therein. We tolerate the Terry patdown to protect the police in the performance of their investigatory duties from serious injury as a result of concealed weapons. Under the circumstances of this case, this goal would have been only half accomplished had the officers not been able to check the front seat. "[T]here can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, 387 U.S. 523, 536-37, 87 S.Ct. 1727, 18 L.Ed.2d 930
(1967). "We judge the permissibility of a particular law enforcement practice by balancing its intrusion on the individual's interests against its promotion of legitimate state governmental interests, and examine the intrusion to determine whether it is the minimum search necessary under the circumstances. State v. Lamme, 19 Conn. App. 594, 599, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484
(1990)." State v. Boisvert, 40 Conn. App. 420, 425, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996).
 On the basis of our review of the record, we conclude that, in light of the facts found by the trial court, the search of the vehicle was constitutionally valid. Ciesinski acted upon his reasonable suspicion, sufficiently articulated in his testimony as credited by the trial court and objectively supported by the circumstances surrounding the encounter, that the defendant might have been armed. Furthermore, the protective search of the recently occupied front seat of the vehicle was properly restricted to the area where the defendant might have dropped something from his hands when he lowered them out the officer's sight. The search did not exceed constitutionally permissible bounds under the federal constitution.
Wilkins, supra, at pp 502-504.
It is crystal clear from these cases that officers who make motor vehicle stops are not required, as the defendant argues, to act by rote. While an officer must act diligently to pursue a CT Page 13481 means of investigation likely to confirm or dispel his suspicions quickly he is not required to follow the same procedure in all cases nor is he required to act in a way that increases his peril. The defendant's insistence that the trooper should have followed a regimented course of conduct is not supported by law or the facts found by the court. Officer in the situation of this trooper acting with an objective, articulated and reasonable belief that a weapon may be concealed, should not be faced with a Hobson's choice that increases his risk. Michigan v. Long, supra, at pp 1051-2.
The defendant has not briefed his further claim that the trooper lost his right, if he ever had one, to search the vehicle for weapons once the suspects left the vehicle. This claim is not sound legally or factually. Even outside, the suspects still had access to the vehicle's interior. In any event if released the suspects could have reentered the vehicle and retrieved a weapon. This issue is without merit. In any event it has been abandoned by the defendant's failure to brief it.
The balance of the defendant's claims including that there were no moving violations that there was no clock, that there was no basis to stop or to prolong the stop, that there was no basis for the trooper to enter the vehicle or to conclude that he had seen a "Philly Blunt" and that the defendant never admitted earlier smoking marijuana, are all fact driven and without merit in view of the court's factual findings.
The defendant's reliance upon State v. Edwards, 1999 WL 596361 (Conn. Super, Devlin, J. July 28th 1999), is both factually and legally misplaced. In mistaken reliance upon a search warrant for a different vehicle the police conducted a full blown narcotics search of the wrong vehicle. While the court recognized the right of the officers to make a protective search for weapons, it concluded the search of the vehicle went far beyond that limited permissible search. There is nothing inEdwards either factually or legally similar to the issues before this court.
The defendant's statement to the officer that he had been smoking marijuana earlier inside the automobile was not the product of an initially illegal stop or an unduly prolonged illegal detention and therefore admissible. These are the only bases upon which the defendant has moved to suppress it. It was available to the trooper as part of his basis for probable cause CT Page 13482 to search the entire vehicle for weapons or drugs.
II STANDING
Having sustained the states primary argument, the court need go no further. However, because standing is a threshhold matter which if determined adversely to the defendant would preclude any further claims, the court is constrained to revisit the issue. The significance of standing requires no less.
Prior to hearing evidence from the state on the merits of this motion, the state challenged the defendant's standing to move for suppression arguing that the defendant had no reasonable expectation of privacy sufficient to confer standing to seek suppression of the marijuana taken from the luggage inside the trunk.
Initially, the court framed the standing issue in terms of whether or not the defendant had a reasonable expectation of privacy in the automobile. Thereupon the defendant, bearing the burden of proof on the issue of standing, through the trooper, offered testimony that the defendant was operating the vehicle, and as the trooper later learned, with the permission of the listed renter, Sherlene Johnson. The court then concluded that the defendant had standing to challenge the search of the automobile. The state reserved the right to argue the defendant's standing to challenge the search of the suitcases themselves and to seize the contents.
The state concedes standing as to the automobile but argues that the defendant has not demonstrated a sufficient interest in the suitcases to warrant standing. The defendant, at oral argument, argued that this court, having found standing vis a vis the automobile itself, cannot now separate standing as to the suitcases. Perhaps in reliance on the court's initial ruling, the defendant's brief does not address standing.
Having heard more evidence and upon further analysis of the law the court concludes that in originally framing the standing issue it painted with too broad a brush. Such a broad threshold inquiry does not adequately address the core issue of whether the defendant could demonstrate a legitimate expectation of privacy in the suitcases themselves. This is not a question of separation but of where the court have should focused its inquiry in the first instance. CT Page 13483
In United States v. Monie, 907 F.2d 793 (8th Cir. 1990) the court phrased the threshold inquiry as follows:
 The first inquiry is whether Monie exhibited an actual subjective expectation of privacy in the objects of the challenged search — in this case, the locked suitcases. Ciraolo, 476 U.S. at 211, 106 S.Ct. at 1811. The second inquiry is whether society is willing to recognize that expectation as reasonable. Id. The first inquiry is a question of fact reviewed under a clearly erroneous standard, and the second is a question of law subject to defendant novo review. United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987).
 Monie, supra, at p 794.
See also United States v. McBean, 861 F.2d 1570 (11th Cir. 1988), United States v. J.B. Rush, 890 F.2d 45 (7th Cir. 1989) andUnited States v. Torres, 949 F.2d 606 (2nd Cir. 1991).
From these cases, some involving strikingly similar factual scenarios to the one found here, emerges the principal that an individual who denies ownership, claims that the contents belonged to someone else and that he had no access to the contents has not only failed to exhibit a subjective expectation of privacy but has unequivocally disavowed any such expectation.
Most informative is the court's language in Monie, stating:
 Although the district court gave Monie ample opportunity, he failed to show that he treated the locked suitcases as objects "he (sought) to preserve as private." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967). Monie was hired merely to drive an automobile rented by others from one point to another. He knew from the beginning the suitcases and their contents belonged to someone else. He did not have permission to open the suitcases in B.C's absence nor any means of access to their contents. Monie did not keep any of his belongings in the suitcases. He did not step in to protect the suitcases when the troopers forced the zippers. All the precautions taken to maintain the secrecy of the suitcases' contents were the handiwork of B.C., not Monie. Indeed, B.G.'s retention of the keys to the suitcases evidenced his CT Page 13484 intent to control the suitcases and deny Monie any basis for shared authority over their contents. United States v. Barry, 853 F.2d 1479, 1482 (8th Cir. 1988). When the troopers asked about the suitcases, Monie stated they were not his, the contents belonged to someone else, and he had no access to the contents. In short, Monie not only failed to exhibit a subjective expectation of privacy. He unequivocally disavowed any expectation. See United States v. Rush, 890 F.2d 45, 48 (7th Cir. 1989); McBean, 861 F.2d at 1574.
Monie, supra, at pp 794-95
In United States v. McBean, the court stated.
 McBean, when asked about the luggage, stated without reservation and unequivocally that the luggage was not his, and that he did not know what the luggage contained. Not only did he fail to manifest a subjective expectation of privacy in the luggage and its contents, he affirmatively disavowed any such expectation. We hold that his disavowal precludes him from challenging the legality of the consent search, and that the district court erred in granting McBean's motion to suppress.
 McBean, supra, at p 48
Similarly, in United States v. J.B. Rush, the court stated:
 Our colleagues in the Eleventh Circuit have stated the governing principle bluntly but correctly: "an individual who abandons luggage at the time of a search is precluded from challenging the legality of the search because he has no legitimate expectation of privacy in the abandoned luggage." McBean, 861 F.2d at 1574. Here, at the time of the officer's inquiry, "[n]ot only did [the defendant] fail to manifest a subjective expectation of privacy in the luggage and its contents, he affirmatively disavowed any such expectation." Id.; see also Knox, 839 F.2d at 293-94.
 J.B. Rush, supra, at p. 48.
It is highly significant that in Monie and McBean the defendant was either operating his own automobile or a rented one with permission, such as the case here. Standing did not focus on CT Page 13485 the vehicle. Instead each court asked whether the defendant had demonstrated a reasonable expectation of privacy in the luggage which had been searched. The situation here is no different.
From these cases, and upon the facts already found by this court the defendant has not demonstrated any reasonable expectations of privacy in the suitcases. The trooper's testimony which this court has found credible was that the defendant denied ownership and access although he said they contained his aunts clothes. By his own testimony the defendant stated he told the troopers the suitcases were not his and he did not know they were in the trunk or what they contained. The defendant further testified that he had been in New York where his friend "Rambo" had asked him to drive the vehicle back to Sherlene Johnson in Hartford. He acquiesced because it was easier than taking the bus back to Hartford. On the present state of the record taking the testimony of either the trooper or defendant at face value, as a preliminary factual issue, the court would find that the defendant had no standing to object to a search of the suitcases because he failed to demonstrate a legitimate expectation of privacy in them. In fact he disclaimed any interest in them and tried to distance himself from them ultimately by flight.
There is a diminished expectation of privacy in automobiles. Here, the defendant, having no ownership interest at all, was operating a vehicle he testified he knew was rented, as an accommodation to his friend, for the fleeting purpose of delivering it to someone else. By his own admission the defendant had no knowledge of what was in the trunk. Such evidence, even at face value, undercuts a legitimate expectation of privacy in those suitcases.
However, in fairness to the defendant since the court's preliminary focus was on the automobile and not the suitcases, if the defendant wishes to offer additional evidence or argument on standing he may do so within the next fifteen days by filing a motion to present additional evidence or argument. In light of his testimony it is problematic as to what such evidence could be. The defendant conceded at oral argument that if the court could separate the automobile from the suitcases, he could not prevail on standing. On the present state of the evidence and subject to the defendant's right to be heard further, this court finds no standing upon which to challenge the search of the suitcases and the seizure of the marijuana. If this is so, the issue of his admission of earlier smoking marijuana in the CT Page 13486 vehicle is moot.
The court has concluded that the stop was initially valid and that as circumstances escalated a protective search for weapons became warranted allowing the trooper to enter the vehicle interior where he found the remnant of an illegal "Philly Blunt" in plain view.
Subject to hearing further from the defendant, the court also finds the defendant has failed to demonstrate any reasonable expectation of privacy in the suitcases.
Either of the above rulings, standing alone, without regard to the issues of consent or inevitable discovery, is sufficient to defeat the motion. Accordingly, the remaining issues are moot and need not be addressed by the court.
The defendant retains the right as stated earlier, to present additional evidence or argument on standing. However, even if the court were to change its ruling on standing, having otherwise ruled the search was valid, the defendant still cannot prevail. Only potential appellate issues would be affected.
Motion denied.
Joseph A. Licari, Jr. Judge of the Superior Court